**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Roger NORDLING,
Defendant-Appellant.**

No. 85–5262.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 9, 1986.

Decided Nov. 25, 1986.

Pat Swan, Asst. U.S. Atty., argued, Peter K. Nunez, U.S. Atty., Pat Swan, Asst. U.S. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.

James Warner, San Diego, Cal., for defendant-appellant.

Before CANBY, REINHARDT and NOONAN, Circuit Judges.

CANBY, Circuit Judge:

Roger Nordling appeals the district court's denial of his motion to suppress physical evidence as well as statements he made to law enforcement officers during his pre-arrest detention. Following the district court's ruling, Nordling entered a conditional guilty plea to one count of possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1).

## BACKGROUND

At about noon on December 12, 1984, Nordling approached the PSA ticket counter at the San Diego Airport; he was carrying a gray tote bag. Using the name H. Sauer, he purchased for cash a ticket to Seattle on PSA Flight 855, which was scheduled to depart within the next half hour. The ticket agent, believing that Nordling resembled a person depicted in a published composite drawing of a suspected

rapist-murderer, notified San Diego Harbor Police.

Harbor Police Officers Dunn and Moriarity responded to the call. The ticket agent verified Nordling's description and told the officers that he had been assigned to seat 27F. The officers proceeded to the gate and boarded the flight. They immediately recognized Nordling as the suspect despite the fact that he was seated in row 22. The officers noted that Nordling appeared nervous and was the only passenger who did not look at them as they moved through the aircraft.

The officers approached Nordling and asked him if his name was Sauer. He identified himself as Nordling, but told the officers that he had no identification and no ticket.[1] The officers told Nordling that they wished to ask him a few questions privately and requested that he leave the plane with them. Because there was a chance Nordling would miss the flight, the officers asked him if he had any luggage or carry-on baggage that he wished to bring with him. He replied that he did not, and he accompanied the officers off the plane, leaving his tote bag under his seat.

At the end of the jetway, the officers verified with the gate agent and the ticket agent that they were dealing with the correct person. They then informed Nordling that he was being detained as a homicide suspect. Nordling appeared relieved and agreed when the officers asked if he would accompany them to the Harbor Patrol office.

Once in the office, Moriarity advised Nordling of his *Miranda* rights. When asked if he were willing to waive his right to silence, Nordling responded, "Yes, if you call my attorney in Washington." Moriarity asked him why he wanted an attorney in Washington; and Nordling said, "He can identify me." Moriarity interpreted this as an equivocal response, and he told Nordling that he needed a "yes or no" answer. He

then reread Nordling his rights, and Nordling unequivocally waived his rights.

During the next 15 to 20 minutes, Nordling told officers that his friend Hank Sauer had purchased the ticket for him. He also gave "vague, evasive" responses to questions about his identity, residence and occupation. He acted nervous and was at times "verbally abusive." Dunn contacted the ticket agent and confirmed that Nordling had purchased the ticket himself and had carried a gray tote bag with him. Even so, Nordling again denied that he had any luggage when he boarded the flight.

The inconsistencies between the ticket agent's statements and Nordling's responses led the officers to suspect that Nordling might be engaged in an illegal narcotics or currency transaction. They accordingly contacted the Narcotics Task Force office, located in another part of the airport. NTF Agents Jordan and Cooper checked Nordling on the Narcotics and Dangerous Drugs Information System (NADDIS) computer and learned he was suspected of being a cocaine dealer with violent tendencies. The NTF agents then responded to the Harbor Police call.

Meanwhile, the San Diego Sheriff's Office told the Harbor Police that Nordling did not match the description of the suspected murderer. Dunn then executed a certificate of release for Nordling and gave it to him shortly before Cooper and Jordan arrived.

Upon arrival, Dunn told the NTF agents that Nordling had been read his rights and had waived them. The agents identified themselves and told Nordling that he would be questioned concerning possible narcotics violations and that he was not free to leave. They asked him to accompany them to their office where they continued questioning him. They asked Nordling again whether he had any baggage. This time, Nordling told them that he had a gray tote bag on board but that he had left it with his girlfriend. He described both

---

1. He claimed that he had left his ticket in a seat, which he could not identify, toward the front of the plane. Nordling told officers that he had been sitting there until a stewardess asked him to move.

the girlfriend and the bag, but he refused to identify her. He indicated that he had not sat with his girlfriend on the plane because he was recently married and worried that he might be seen with another woman. He also repeated his story that his friend Hank Sauer had purchased his airline ticket for him.

The NTF agents contacted narcotics officers in Seattle and asked them to await the plane's arrival. Meanwhile, for approximately three hours, Nordling was held at the NTF office even though he was not formally under arrest. At some point in the afternoon, Agent Jordan decided that he should verify Nordling's identity and asked Nordling who could identify him. Nordling responded that his lawyer could and that he wanted to speak with his lawyer. Jordan denied the request.

In Seattle, narcotics officers placed Flight 855 under surveillance, looking specifically for a blonde woman matching the description Nordling had provided. No such woman was observed, and no one leaving the plane was seen carrying a gray tote bag. Shortly thereafter, a PSA employee turned the bag over to the officers, saying it had been left on the plane under a seat in row 22 or 23. The bag had no external identification.

A trained narcotics dog alerted when presented with the bag. Back in San Diego, the NTF agents asked Nordling whether he would consent to a search of the bag. When told that officers would seek a warrant if he did not consent, Nordling agreed to permit the search. Inside, they found nearly one pound of cocaine [2] plus Nordling's wallet, complete with several pieces of identification, and other personal effects. Nordling was then placed under arrest. When Nordling was searched incident to arrest, the plane ticket in Sauer's name was found in his back pocket.

**DISCUSSION**

### I. *Admissibility of the Tote Bag*

The district court held that the tote bag and its contents were admissible against Nordling because he had abandoned the property and so had relinquished any expectation of privacy in the bag.[3] A determination of abandonment is a factual finding that we review for clear error. *United States v. Mendia*, 731 F.2d 1412, 1414 (9th Cir.), *cert. denied*, 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 399 (1984). Because warrantless searches or seizures of abandoned property do not violate the fourth amendment, *e.g., Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960), persons who voluntarily abandon property lack standing to complain of its search or seizure, *United States v. Jackson*, 544 F.2d 407, 409 (9th Cir.1976).

On the record before us, the district court's finding of abandonment was not clearly erroneous. We have recognized that abandonment is a question of intent. The inquiry should focus on whether, through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure. *E.g., United States v. Cella*, 568 F.2d 1266, 1283 (9th Cir.1977); *Jackson*, 544 F.2d at 409. This determination is to be made in light of the totality of circumstances, and two important factors are denial of ownership and physical relinquishment of the property. Both of these factors are present here.

Nordling twice denied having any carry-on baggage with him on Flight 855. Although the first denial was equivocal, the second was clear. Nordling indicated he had no such baggage when Harbor Police officers asked him to leave the plane and advised him that he might well miss his flight. He repeated his denial when con-

---

**2.** Subsequent laboratory analysis showed the cocaine to be 98–percent pure.

**3.** The court alternatively held the evidence admissible because Nordling had consented to the search. Nordling here contends that his con-

sent was the fruit of an unlawful detention and so was invalid. Because of our conclusion that Nordling had abandoned the property, we need not reach this issue.

fronted with the conflict between his statement and the report from the PSA ticket agent that he had a gray tote bag. These denials objectively demonstrate an intent to abandon the property. *E.g., United States v. Veatch,* 674 F.2d 1217, 1221 (9th Cir. 1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982); *Jackson,* 544 F.2d at 411.

Beyond his denial of ownership, Nordling physically relinquished control of the tote bag when he left it on the airplane where anyone, including the PSA employee who found it in Seattle, could have access to it. That act of relinquishment, under the circumstances in which Nordling found himself, also supports an inference that he intended to abandon the bag. *See Mendia,* 731 F.2d at 1414. While everyone who leaves luggage on an airplane cannot be said to have abandoned it, Nordling deliberately chose to leave the bag behind when requested by officers to leave the plane. The district court could well find that his actions were inconsistent with a continued expectation of privacy in the property. *See, e.g., United States v. Dela Espriella,* 781 F.2d 1432, 1437 (9th Cir.1986) (trash put out for collection); *United States v. Jones,* 707 F.2d 1169, 1171 (10th Cir.) (satchel left on ground during pursuit), *cert. denied,* 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983); *see also Hester v. United States,* 265 U.S. 57, 58, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924) (items left in field).

We reject Nordling's argument that his later admission that he owned the bag constituted a reassertion of interest in the property. As the district court viewed the facts, Nordling disclaimed ownership and left the bag on the airplane in circumstances in which it was virtually certain that the bag would be opened, inspected and turned over to law enforcement authorities before he could possibly attempt to reexert physical control. It also found that, in light of those facts, Nordling's admission of ownership in the course of later questioning did not constitute a reassertion of a privacy interest in the bag. We cannot say that

the district court's findings were clearly erroneous.

## II. Miranda *Violation*

Nordling also contends that statements he made while in custody of both the Harbor Police and the NTF agents were acquired by police in violation of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Nordling points to two occasions in which he asked to contact his lawyer but was refused permission.

██ Before a custodial interrogation can begin, a suspect must be advised of his rights to remain silent and to have an attorney present. *Id.* at 479, 86 S.Ct. at 1630. If the suspect requests counsel, the interrogation must cease until an attorney arrives. *Id.* at 474, 86 S.Ct. at 1627. Statements taken in violation of these rules must be suppressed. The issue here is whether Nordling adequately asserted his right to have counsel present during questioning.

In *United States v. Fouche,* 776 F.2d 1398, 1404–05 (9th Cir.1985), we explored the question of what constitutes a valid assertion of the right to counsel. We held that where a suspect makes an equivocal assertion of the right to counsel, police must cease all questioning, except that they may attempt to clarify the suspect's desire for counsel. We stressed that "[q]uestions aimed at clarifying the desire for counsel must be strictly limited to that purpose; they may not be used to elicit incriminating information." *Id.* at 1405. Moreover, if the clarification reveals that the suspect wants counsel, interrogation must cease until counsel is provided. If, however, the clarification "reveals that the suspect does not want counsel, the interrogation may continue." *Id.*

### A. *Interrogation by the Harbor Police*

Moriarity informed Nordling of his *Miranda* rights shortly after their arrival at the Harbor Police office. When Moriarity asked whether Nordling wished to waive his right to remain silent, Nordling responded, "Yes, if you call my attorney in Washington.... He can identify me."

Nordling never asked to contact his attorney himself; instead, he requested that Moriarity contact counsel so that officers could confirm Nordling's identity.

Moriarity interpreted this as an equivocal response and told Nordling that he needed a "yes or no" response to the question. Having said this, Moriarity immediately read Nordling his rights again and again asked Nordling whether he understood the rights and wished to waive them. This time Nordling responded with an unqualified "yes" to each question, and the interrogation began.

■ We conclude that the *Fouche* requirements were satisfied at this point. Nordling indicated only that he wanted police to contact his attorney for purposes of identification. This response can reasonably be interpreted as equivocal. Following it, the officer explained that he needed an unequivocal response, and he readministered the *Miranda* warnings without delay or additional questioning. Nordling then agreed to waive his rights unconditionally. Accordingly, Nordling's statements to the Harbor Police were admissible against him.

### B. *Statements to the NTF Agents*

Nordling argues that, even if his statements to the Harbor Police were admissible, his statements to the NTF agents should have been suppressed. He complains, first, that he was not given new *Miranda* warnings by the NTF agents and, second, that his repeated requests for an attorney there were ignored.

### 1. *Failure to Readminister* Miranda *Warnings*

■ Evaluating the totality of the circumstances, we conclude that there was no need for NTF agents to administer new

*Miranda* warnings in this case. The record shows that the NTF agents asked the Harbor Police whether Nordling had been advised of his rights. They were told, correctly, that Nordling had been read his rights and had waived them. No appreciable time had elapsed between the end of the Harbor Police interrogation and the beginning of the NTF investigation. Nordling was properly apprised of the scope of the NTF inquiry, and he did nothing to reassert his rights to silence or counsel, at least initially. *Cf. Wyrick v. Fields*, 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982) (per curiam) (no need to readminister rights to a defendant, who had been told his rights and had waived them prior to a polygraph examination, before questioning him about the results of the polygraph); *Stumes v. Solem*, 752 F.2d 317 (8th Cir.) (totality of circumstances showed no need to readminister rights prior to a second interview where defendant had received and properly waived his rights before a first interview five hours earlier), *cert. denied*, 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985).

### 2. *Refusal to Contact Counsel*

After Nordling and the NTF agents returned to the NTF office, a detailed interrogation began. At some point during this interrogation, NTF Agent Jordan decided to verify Nordling's identity to ensure that they were in fact holding the person they thought they were. Jordan asked Nordling who could identify him, and Nordling responded clearly that his lawyer could. He also stated that he wanted to speak with his lawyer. Agent Jordan told him that they were "not prepared at that time to phone any lawyer," in accordance with the NTF's prior practice.[4]

---

**4.** As NTF Agent Cooper explained at the suppression hearing:

> There's a lot of things in the past that have happened that are not in law enforcement's favor when we let defendants contact lawyers. It has compromised investigations severely....

> So we—we tell them that they can make a phone call to the lawyer if and when the person is arrested or if he goes to jail....

We find this statement from law enforcement officials most disturbing. It is quite obvious that the presence of an attorney may impede an investigation because the attorney will often ensure that a suspect does not lightly give up his right against self-incrimination. U.S. Const.

We conclude that Nordling's request at this point was an adequate assertion of his right to counsel. Although the request came again in the context of police efforts to verify his identity, Nordling clearly asked this time to speak with his attorney. He was refused. Statements Nordling made after this point must accordingly be suppressed.

Unfortunately, the record is unclear as to precisely when during the NTF interrogation this denial of Nordling's right to counsel occurred. We therefore leave it to the district court on remand to determine which of Nordling's statements must be suppressed.

### CONCLUSION

The district court properly ruled that Nordling's tote bag and its contents were admissible against him. Further, many of Nordling's statements on the afternoon of December 12, 1984, were taken after he properly waived his rights to silence and counsel. Nonetheless, some of Nordling's incriminating statements may have come after he reasserted his right to counsel during interrogation by NTF agents.

Because Nordling entered a conditional guilty plea and has prevailed in part in this appeal, he must have the opportunity to reconsider his plea. Fed.R.Crim.P. 11(a)(2). We therefore vacate his conviction and remand the cause. If Nordling decides to change his plea, his cause should be set for trial. If he does not withdraw the plea, the district court may re-enter the judgment of conviction. *See United States v. DiCesare,* 777 F.2d 543 (9th Cir.1985) (amending 765 F.2d 890 (9th Cir.1985)).

VACATED AND REMANDED.

amend. V; *see, e.g., Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Whether it is helpful or harmful to the police, it is a suspect's clear constitutional right to have

an attorney present during questioning, and it is not for police officers to determine at what point it is appropriate to permit counsel to be present.