UNITED STATES of America, Appellee,

v.

Richard MOSKOWITZ,
Defendant–Appellant.

No. 1199, Docket 89–1107.

United States Court of Appeals,
Second Circuit.

Argued April 26, 1989.

Decided Aug. 9, 1989.

Lawrence H. Schoenbach, New York City, for defendant-appellant.

Bonnie S. Klapper, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., David C. James, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Before OAKES, Chief Judge, WISDOM * and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Defendant-appellant Richard Moskowitz appeals from a judgment of conviction entered after a jury trial in the United States District Court for the Eastern District of New York, Dearie, J. Moskowitz was convicted of one count of recklessly causing, in violation of federal regulations, the transportation in air commerce of hazardous materials, 49 U.S.C.App. § 1472(h)(2) (1982), one count of willfully violating federal regulations by causing the transportation in air commerce of hazardous materials, 49 U.S.C.App. § 1809(a)(1), (b) (1982), one count of possessing cocaine, 21 U.S.C. § 844 (Supp. V 1987), and one count of possessing heroin, 21 U.S.C. § 844 (Supp. V 1987). He appeals his convictions, as well as the sentence imposed under the Federal Sentencing Guidelines (codified as amended at 18 U.S.C.A.App. (West Supp.1989)) ("Sentencing Guidelines" or "Guidelines"). We affirm in part and vacate and remand in part.

---

* Honorable John Minor Wisdom, United States Circuit Judge for the Fifth Circuit, sitting by designation.

## BACKGROUND

The government offered evidence to prove the following facts. On February 29, 1988, Moskowitz, Jeffrey Toffler and Denise Brookshire were freebasing cocaine at Moskowitz's apartment in New York City. Freebasing involves the smoking of cocaine after it has been heated so as to purify it. Later that day, the group moved to Toffler's apartment, where they were joined by Janelle Lilliquist. Both Moskowitz and Brookshire carried with them equipment necessary for freebasing cocaine. These items included the cocaine, a pipe, a torch and canisters of butane. Moskowitz also brought two pieces of luggage with him to Toffler's apartment, as the group planned to fly to Miami, Florida the next day. Moskowitz, Toffler and Brookshire continued to freebase cocaine that evening.

On the morning of March 1, the group, which now included Christine Dalfonso, prepared to leave for John F. Kennedy International Airport (JFK). The group anticipated taking their drug paraphernalia with them to Miami. Toffler specifically instructed Brookshire to pack the canisters of butane so that they would not have to go out to buy more once they were in Florida. Brookshire estimated that she packed over a week's supply of butane. She offered to carry the butane in her luggage because she knew how to evade airport metal detectors. On the way to the airport, Toffler assured Brookshire that the group would be able to "cook up" on the plane.

At JFK, Special Agent Joseph Reynolds of the United States Customs Service and Special Agent Richard Shields of the Drug Enforcement Administration were in line waiting to purchase tickets for Eastern Airlines Flight # 977 to Miami. The agents were travelling to Miami to testify at a trial. They observed Moskowitz and Toffler waiting in line for the same flight. The agents noticed Moskowitz's ashen complexion and loud, abrasive behavior. He appeared to be under the influence of alcohol or drugs. The agents saw Moskowitz checking luggage.

On the plane, Moskowitz, Brookshire and Dalfonso were seated in row fourteen, four rows behind the agents. Toffler and Lilliquist were seated in first class. Before take-off, Moskowitz was heard moaning. A flight officer inquired if he was alright, and Moskowitz said that he had stomach pain but was taking medication.

Shortly after take-off, flight attendants detected an odor they believed to be ether in the area of row fourteen. Flight attendant George Morejon, walking up the aisle to investigate, noticed that Moskowitz was no longer in his seat. Aware of Moskowitz's earlier discomfort, Morejon walked to the rear of the plane to see if he needed assistance. In the vicinity of the lavatories, Morejon detected a strong odor he likened to burning chemicals. Pursuant to fire emergency procedures, he opened the lavatory doors. In one of the lavatories, he found Moskowitz. Moskowitz was standing holding a glass pipe filled with thick, swirling smoke.

Morejon immediately notified the cockpit crew of what he had seen, saying that there was a fire hazard. He then sought the assistance of Agents Reynolds and Shields. The agents accompanied Morejon to the lavatory, but Moskowitz was no longer there. After searching the plane and not finding him, the three returned to look in the other lavatories. Morejon again opened the doors. Moskowitz was found sitting on a toilet, fully clothed, clutching an air sickness bag with a pipe protruding from it. Morejon and the two agents all noticed the odor of something burning.

Reynolds identified himself as a federal agent and asked Moskowitz what was in the bag. Saying nothing, Moskowitz handed the bag containing the pipe to Agent Reynolds. The bag contained a round glass pipe which Agent Reynolds observed to be filled with smoke. The pipe was later found to contain traces of cocaine. Reynolds asked Moskowitz if he could look in his jacket. Moskowitz handed the jacket to the agent, who then handed it to Agent Shields. Inside the jacket Shields found a butane torch and other drug paraphernalia. The agents requested Morejon to search

the lavatory. Morejon found other drug-related glassware hidden behind the walls of the lavatory.

Moskowitz was immediately arrested. Agent Reynolds read Moskowitz his rights under *Miranda v. Arizona*, 384 U.S. 436, 467–73, 86 S.Ct. 1602, 1624–27, 16 L.Ed.2d 694 (1966). Despite being informed of his right to remain silent, Moskowitz chose to speak, saying "can you give me a break?" and "does this mean I'm not going to Miami on vacation?" Moskowitz was handcuffed and buckled into a seat in the by then evacuated, rear section of the plane. Agent Shields stayed with Moskowitz, while Agent Reynolds moved toward the front of the plane to maintain surveillance on Moskowitz's travelling companions. Morejon testified that Moskowitz, while thus restrained, threatened him.

At some point during these events, the pilot turned the plane around to return to New York. Morejon testified that this occurred after he informed the cockpit crew of the circumstances surrounding the arrest of Moskowitz.

When the plane landed at JFK, Agent Reynolds approached Brookshire and Dalfonso, identified himself as a federal agent and asked them to accompany him to the first class section. The two followed the agent to the first class seats of Toffler and Lilliquist. Reynolds again identified himself and then informed the group that he had reason to suspect that they were carrying flammable or controlled substances. He asked to inspect their carry-on bags. Consent was given. The bags carried by Dalfonso and Brookshire were found to contain several butane torches, a butane canister, canisters of nitrous oxide and various glassware and other materials used in freebasing cocaine. A patdown of Toffler revealed an envelope containing cocaine. Removed from the plane, Toffler, Dalfonso and Brookshire were placed under arrest. More cocaine was then found on the persons of Toffler and Brookshire.

Meanwhile, Agent Shields escorted Moskowitz off the plane and placed him in the custody of the Port Authority Police.[1] Shortly thereafter, on the ground, Shields overheard a Port Authority police officer ask Moskowitz if he had any checked luggage. Moskowitz responded that he did not. Shields informed officers that he had seen Moskowitz checking baggage. Federal Bureau of Investigation (FBI) Agent Vincent J. McNally was also at the scene when the plane arrived at JFK. He testified that he too asked Moskowitz if he had any checked luggage, and Moskowitz answered that he did not. Subsequently the baggage checked by those arrested was located and removed from the plane, as was the carry-on luggage already searched. Later, the plane took off again for Florida.

The four arrestees were taken to the Port Authority Police airport office to be interviewed. The luggage removed from the plane was also taken there. All the individuals except Moskowitz consented to searches of their luggage. A checked bag claimed by Toffler was found to contain a canister of butane.

Moskowitz, being interviewed by FBI Agent Timothy Rembijas, refused to say anything more about the incident, although he did provide some pedigree information. By this time, only two of the bags remained unclaimed. Agent Rembijas asked Moskowitz several times if the two bags were his, but Moskowitz refused to say anything. Agent Rembijas then searched the two bags. One of the bags was a gray garment bag that had been checked and which bore a baggage claim number corresponding to the baggage ticket on Moskowitz's airline ticket. In this bag Agent Rembijas found a cigarette box containing packets of cocaine and heroin. The search of the two bags occurred some three hours after the plane had landed.

Moskowitz was tried under a six count indictment that read as follows:

1. When federal agents make arrests at JFK, it is customary procedure for state authorities to perform routine processing at the Port Authority Police airport office. *See United States v.* *Colon*, 835 F.2d 27, 29 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1279, 99 L.Ed.2d 490 (1988).

*Count One* ... Moskowitz ... did knowingly and willfully place and cause to be placed destructive devices and substances in [the] aircraft so that such placing and causing to be placed was likely to endanger the safety of [the] aircraft. [18 U.S.C. § 32(a)(2) ]

*Count Two* ... Moskowitz ... did knowingly and intentionally intimidate and threaten George Morejon, a flight attendant of [the] aircraft, so as to interfere with the performance ... of his duties and to lessen [his] ability ... to perform his duties. [49 U.S.C. app. § 1472(j) ]

*Count Three* ... Moskowitz ... did knowingly and recklessly cause the transportation in air commerce of baggage and property containing hazardous materials, to wit: approximately twenty-four canisters of nitrous oxide compressed gas and approximately ten flammable butane fuel canisters, in violation of the rules, regulations and procedures issued by the Secretary of Transportation as set forth in Title 49, Code of Federal Regulations, Sections 171 *et seq.* [49 U.S.C. app. § 1472(h)(2) ]

*Count Four* ... Moskowitz ... did willfully violate the regulations issued by the Secretary of Transportation as set forth in 49 Code of Federal Regulations, Sections 171 *et seq.*, by causing the transportation aboard [the] aircraft of hazardous materials, to wit: approximately twenty-four canisters of nitrous oxide compressed gas and approximately ten flammable butane fuel canisters. [49 U.S.C. app. §§ 1809(a)(1), 1809(b) ]

*Count Five* ... Moskowitz ... did knowingly and intentionally possess a quantity of cocaine, a Schedule II narcotic drug controlled substance. [21 U.S.C. § 844]

*Count Six* ... Moskowitz ... did knowingly and intentionally possess a quantity of heroin hydrochloride, a Schedule I narcotic drug controlled substance. [21 U.S.C. § 844]

Moskowitz's motion to suppress the items seized from him and his luggage, as well as statements made by him, was denied after a suppression hearing. After a jury trial, Moskowitz was convicted under Counts Three, Four, Five and Six, but was acquitted under Counts One and Two. He was sentenced under the Sentencing Guidelines to terms of imprisonment of eighteen months on each of Counts Three and Four and twelve months on each of Counts Five and Six. The terms of imprisonment were to run concurrently. The sentence also included concurrent terms of supervised release of three years on each of Counts Three and Four and one year on each of Counts Five and Six. Moskowitz also was fined $10,000 on each of Counts Three, Four, Five and Six, for a total fine of $40,000. In addition, Moskowitz was ordered to pay a special assessment in the amount of $50 on each of Counts Three and Four and $25 on each of Counts Five and Six, for a total of $150.

Moskowitz appeals his convictions and his sentence. We affirm in part and vacate and remand in part.

## DISCUSSION

Moskowitz raises four arguments on appeal. He contends that (1) the district court erred in denying his motion to suppress physical evidence found in his checked luggage, (2) there was insufficient evidence to demonstrate his knowledge of the Federal Aviation Administration regulations concerning hazardous materials, (3) the district court's sentencing of him under Counts Three and Four constituted an unlawful "pyramiding" ·of penalties, and (4) the district court misapplied the Sentencing Guidelines.

### A. *The Motion to Suppress*

In his pretrial suppression motion, Moskowitz sought suppression of the materials seized from him on the plane, the statements made by him and the materials taken from his checked luggage. Moskowitz's motion was denied. On this appeal, Moskowitz takes issue only with admission of the evidence seized from his checked luggage. The district court found that Moskowitz had intended to abandon his checked luggage, and therefore had no basis to challenge a search of the bags. We agree.

Moskowitz maintains that his checked bags were searched without a warrant in violation of his constitutional rights under the Fourth Amendment. It is conceded that Moskowitz's bags were searched without a warrant. Nevertheless, "[s]ince one forfeits any reasonable expectation of privacy upon abandoning one's property, a warrantless search or seizure of abandoned property does not violate the fourth amendment." *United States v. Levasseur,* 816 F.2d 37, 44 (2d Cir.1987); *see Abel v. United States,* 362 U.S. 217, 240–41, 80 S.Ct. 683, 697–98, 4 L.Ed.2d 668 (1960). If Moskowitz abandoned his two checked bags, he has no grounds to challenge the legality of a subsequent search of the bags. *See United States v. Knox,* 839 F.2d 285, 293–94 (6th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989); *United States v. Nordling,* 804 F.2d 1466, 1469 (9th Cir.1986).

In considering whether Moskowitz abandoned his luggage and thereby forfeited his expectation of privacy, the district court properly focused on the question of Moskowitz's intent. *See United States v. Thomas,* 864 F.2d 843, 846 (D.C.Cir.1989); *United States v. McKennon,* 814 F.2d 1539, 1546 (11th Cir.1987) (per curiam); *Nordling,* 804 F.2d at 1469; *United States v. Scrivner,* 680 F.2d 1099, 1100 (5th Cir. 1982). The district court's finding that Moskowitz intended to abandon his luggage is a finding of fact. *See Levasseur,* 816 F.2d at 44. On review, we will uphold the district court's finding unless it was clearly erroneous. *See Thomas,* 864 F.2d at 846; *Nordling,* 804 F.2d at 1469; *United States v. Mendia,* 731 F.2d 1412, 1414 (9th Cir.), *cert. denied,* 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 399 (1984).

The district court's finding that Moskowitz intended to abandon his checked baggage was not clearly erroneous. After Moskowitz had been led from the plane following his arrest, FBI Agent McNally asked him if he had any checked luggage. Moskowitz unequivocally replied that he did not. Agent Shields testified that he overheard a Port Authority police officer ask Moskowitz the same question: did he have any checked luggage? Consistent with his response to Agent McNally, Moskowitz responded that he did not.

In addition to Moskowitz having twice explicitly denied that he had checked luggage, the circumstances support an inference that Moskowitz intended to abandon the bags. *See Nordling,* 804 F.2d at 1470. At the time he denied having checked bags, it should have been apparent to Moskowitz that if his bags were not removed from the plane, they would continue on to Florida without him. The prospect of having one's luggage sit unclaimed in a distant airport would likely alarm the ordinary vacationer, interested in protecting the safety and privacy of personal belongings. Moskowitz exhibited no such anxiety. Nor is this surprising, as it seems quite reasonable that Moskowitz would eagerly opt to abandon his bags. Having already been arrested and knowing that his bags contained cocaine and heroin, Moskowitz had every reason to put distance between himself and his luggage.

Faced with what we consider to be a rather explicit abandonment of his luggage, Moskowitz's argument on appeal emphasizes developments subsequent to his statements disavowing the bags, specifically, the circumstances surrounding his interrogation at the Port Authority Police office by Agent Rembijas.

Moskowitz notes that when the bags were placed in the room in which he was being held, they had tags on them indicating that they belonged to him. He contends that there was no evidence that Agent Rembijas had been told of Moskowitz's earlier statements that he had no checked luggage. The suggestion is that Agent Rembijas, when he searched the bags, knew that the bags belonged to Moskowitz and had no reason to think otherwise. This attempt to limit the inquiry to what Agent Rembijas believed at the time he conducted the search misconceives the issue here. As we have said, "[t]he facts and circumstances pertinent to the court's abandonment inquiry are not limited to those which were known to the officers at the time of the search or seizure." *Levasseur,* 816 F.2d at 44. This is so because the

issue here is not the subjective state of mind of Agent Rembijas as he conducted the search. Rather, the issue is whether Moskowitz had manifested an intent to abandon his luggage, thereby forfeiting his expectation of privacy. *See id.* A finding that Moskowitz had abandoned his bags is in no way undermined by Moskowitz's contentions that Agent Rembijas subjectively believed the bags belonged to Moskowitz and that the agent was unaware that Moskowitz had abandoned the bags. *Cf. United States v. Roy,* 734 F.2d 108, 110–12 (2d Cir.1984) (because defendant was an escaped prisoner, he had no reasonable expectation of privacy in car even though police officers had no knowledge of his escaped status), *subsequent appeal,* 771 F.2d 54, 55 n. 1 (2d Cir.1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1520, 89 L.Ed.2d 918 (1986).

Moskowitz emphasizes that the bags were not searched until hours after his negative responses to the two inquiries as to whether he had checked luggage. Indeed, he concedes that the district court's ruling "would have been absolutely correct if the search of appellant's checked baggage had been conducted at the jetway when he was removed from the plane, or even soon thereafter." Moskowitz suggests that because he was entitled to remain silent throughout the time he was held at the Port Authority Police office, his failure to acknowledge ownership of the bags during that interim period cannot constitute abandonment.

Moskowitz's argument incorrectly suggests that the finding of abandonment was in some way based on his refusal to respond to Agent Rembijas' questioning at the Port Authority Police office. The district court in no way relied on Moskowitz's constitutionally protected silence in the face of questioning as the basis for its finding that Moskowitz intended to abandon his luggage. Moskowitz did not abandon his bags by remaining silent in the face of interrogation about the bags. Rather, he abandoned his bags earlier when, after having been advised of his right to remain silent and having elected not to do so, he twice stated as he left the plane that he had no checked luggage.

It is true that the relevant question for the issue of abandonment is intent at the time of the search. *See McKennon,* 814 F.2d at 1546; *Nordling,* 804 F.2d at 1469. Nevertheless, that does not mean that the effect of Moskowitz's statements that he had no luggage must lapse after some period of time. Once the bags were abandoned, they would remain abandoned until Moskowitz somehow came to "repossess" them. The fact that the bags were not immediately searched does not undermine a finding that Moskowitz had abandoned the bags.

We need not consider if or how, having voluntarily abandoned the luggage, Moskowitz might have reasserted his ownership and thereby reacquired a reasonable expectation of privacy before the bags were searched. We recognize the possibility that, before a search takes place, one might "repossess" property that previously had been abandoned. *See United States v. Burnette,* 698 F.2d 1038, 1047–48 (9th Cir.), *cert. denied,* 461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.2d 312 (1983); *cf. Nordling,* 804 F.2d at 1470 (no reassertion of interest in abandoned bag where defendant admitted leaving bag on plane "in circumstances in which it was virtually certain that the bag would be opened, inspected and turned over to law enforcement authorities before he could possibly attempt to reexert physical control"). We nevertheless conclude that Moskowitz did not do so. Under Moskowitz's own version of events, he did not say or do anything to assert or acknowledge any ownership or control of the bags, even when specifically asked about them. He displayed no interest in or recognition of the bags. This behavior, where others in his presence were exercising control over the bags, did not "manifest[ ] a subjective expectation of privacy" in the bags. *See California v. Greenwood,* 486 U.S. 35, ——, 108 S.Ct. 1625, 1628–30, 100 L.Ed.2d 30 (1988); *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811–12, 90 L.Ed.2d 210 (1986).

We do not question Moskowitz's position that he had the right to remain silent and ignore his incriminating luggage at all

times following his arrest. Had Moskowitz chosen to do so, this would be a different case. Instead, Moskowitz voluntarily chose to speak despite being advised of his right to remain silent. When he did speak, he thereby abandoned his luggage. Having done so, he could not have reacquired the forfeited reasonable expectation of privacy in the luggage merely through silence and inaction, even constitutionally protected silence and inaction.

Moskowitz seems to argue that his abandonment was the result of improper police conduct and therefore should be considered ineffective. Were there a causal nexus between some improper police conduct and his expressed abandonment of the luggage, Moskowitz's argument might have merit. *See United States v. Roman,* 849 F.2d 920, 922–23 (5th Cir.1988); *United States v. Gilman,* 684 F.2d 616, 620 (9th Cir.1982). Such is not the case here.

The statements that Moskowitz did make—that he did not have checked luggage—were not the result of any police misconduct. The district court found that the arrest of Moskowitz was legal, that Moskowitz had been advised of his constitutional rights and that he had knowingly and voluntarily waived them. The court also rejected the argument that Moskowitz's "narcotics related activities" rendered him unable to make a knowing and voluntary waiver. Moskowitz does not challenge these findings on appeal. He advances no reason why the questions about checked luggage put to him by Agent McNally and the Port Authority police officer were improper. Thus, we are unable to see how the statements made by Moskowitz to the effect that he had no checked luggage could have been the result of improper police conduct. Moskowitz's "disclaimers of ownership of the luggage were ... not precipitated by improper conduct on the part of law enforcement agents." *See United States v. Tolbert,* 692 F.2d 1041, 1048 (6th Cir.1982), *cert. denied,* 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983); *see also Gilman,* 684 F.2d at 620 ("no infirmities in police conduct such as to render the abandonment involuntary"). In the absence of any misconduct, the mere fact that Moskowitz's statements were made in response to questions by law enforcement officials does not render his abandonment involuntary. *See Gilman,* 684 F.2d at 620; *cf. Thomas,* 864 F.2d at 846 n. 4 (abandonment during police pursuit).

With respect to the later developments at the Port Authority Police office, Moskowitz does suggest that there was misconduct connected with the circumstances surrounding his insisting on remaining silent in the face of questioning by Agent Rembijas. But again, Moskowitz had explicitly abandoned his luggage before the questioning by Rembijas, and Moskowitz's subsequent silence was not taken by the district court as indicative of an intent to abandon.

The district court's finding that Moskowitz abandoned his luggage was not clearly erroneous. Having abandoned the luggage, Moskowitz had no claim to suppression of the evidence seized therein. The evidence was properly admitted.

B. *Sufficiency of the Evidence of Moskowitz's State of Mind*

 Moskowitz argues that there was insufficient evidence concerning his state of mind to sustain his convictions under Counts Three and Four. The jury was charged that to convict Moskowitz of violating 49 U.S.C.App. § 1472(h)(2) under Count Three, it had to find that he acted recklessly. It also had to find, however, that "the defendant knew that his acts would result in the transportation of baggage containing hazardous materials and knew that such transportation was in violatio[n] of federal rules, regulations and requirements, or that such consequences were reasonabl[y] foreseeable." With respect to the 49 U.S.C.App. § 1809(b) charge under Count Four, the jury was instructed that "it is not sufficient that a defendant merely violated a regulation. He must also have known about the regulation, and with that knowledge, violated the regulation vo[l]untarily and intentionally." *Cf. United States v. Allied Chemical Corp.,* 431 F.Supp. 361, 369 (W.D.N.Y.1977). Thus, under the charges for both Counts Three and Four, the jury, in order to convict, had

to find that Moskowitz knew that transporting the butane or nitrous oxide canisters aboard the plane was a violation of federal regulations. Neither Moskowitz nor the government argues that the charge was in any way improper.

Moskowitz maintains that the government failed to demonstrate that he knew that federal regulations prohibited carrying the butane and nitrous oxide canisters on the plane. Thus, he concludes, the convictions on Counts Three and Four were not supported by sufficient evidence. Moskowitz's argument echoes his defense position at trial. With respect to butane in particular, defense counsel attempted to persuade the jury that Moskowitz was unaware that carrying it on the plane was prohibited. It was pointed out that exemptions in the regulations permit small amounts of butane to be carried on planes, as in hair spray or cigarette lighters. Defense counsel argued in summation that there was no evidence to show that Moskowitz knew of the distinctions drawn by the regulations. The suggestion was that because travellers are permitted to carry butane on planes every day in cigarette lighters or toiletries, there was no reason for Moskowitz to believe that transporting ten canisters of the gas was prohibited. Therefore, the argument would conclude, the required *mens rea* was lacking.

"[A] defendant challenging the sufficiency of the evidence on appeal bears a heavy burden. We must view the evidence in the light most favorable to the government, resolving all issues of credibility in its favor and drawing all permissible inferences of guilt." *United States v. Friedman*, 854 F.2d 535, 553 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). Moreover, the issue is not whether we, the reviewing court, believe that the evidence established guilt. Rather, the question before us is whether *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Applying these well established standards, we find that there was sufficient evidence to prove Moskow-

itz's guilt under Counts Three and Four beyond a reasonable doubt.

Denise Brookshire testified that on the morning of the flight, she, Moskowitz and the rest of the travelling group were in Toffler's apartment. As the group prepared to leave for the airport, she offered to carry canisters of butane in her luggage because she knew how to get them through the airport metal detector. Although the concern behind the effort to conceal the canisters might have been to avoid alerting airport authorities to the presence of drugs, we think a reasonable jury could conclude that Brookshire's testimony, together with all the evidence of the group's actions, revealed an awareness that the canisters of butane themselves were items that needed to be concealed from airport authorities.

The government also offered evidence to show that several notices were posted at the airport stating that federal law prohibited carrying hazardous materials aboard a flight in one's luggage or on one's person. These hazardous materials were described as including flammable liquids and compressed gases. The signs explained that there were exceptions for "small quantities ... of medicinal and toilet articles" and "certain smoking materials." The reader was advised to contact an airline representative for further information. Evidence indicated that on March 1, 1988 at the Eastern terminal, the signs were posted at the entrances to the terminal, at the ticket counter and at the boarding gate for Flight # 977. There was evidence to show that Moskowitz had been in a position to view these warnings, and that he had been coherent enough to read and understand them.

Certainly, the mere presence of these signs does not conclusively establish Moskowitz's knowledge of the regulations. A factfinder could conclude that the signs were too small to have been seen or too complicated to have been understood, even by one not under the influence of drugs. Indeed, defense counsel elicited testimony to support these arguments, and he made these points to the jury in summation. Our

task is not to conclude whether Moskowitz read and understood the signs. Such factual questions were uniquely suited for resolution by the jury. The jury rejected Moskowitz's various arguments and concluded that he knew that canisters of butane and nitrous oxide could not legally be carried on the airplane. The jury's conclusions that Moskowitz possessed sufficient knowledge of the applicable regulations so as to act willfully to violate 49 U.S.C.App. § 1809(b) and recklessly to violate 49 U.S.C.App. § 1472(h)(2) were supported by sufficient evidence.

## C. *Multiple Punishments*

■ Moskowitz also argues that the effect of his sentences under Counts Three and Four was to impermissibly punish him twice for the same conduct. As detailed *supra,* Count Three charged Moskowitz with violating 49 U.S.C.App. § 1472(h)(2) by knowingly and recklessly causing the transportation in air commerce of butane and nitrous oxide in violation of federal regulations. Count Four charged him with violating 49 U.S.C.App. § 1809(b) by willfully violating those same federal regulations by causing the same butane and nitrous oxide to be transported on the same plane. Moskowitz argues that the only difference between the two charges was the state of mind required. Therefore, he concludes that Count Three, requiring only recklessness, was a lesser included offense of Count Four, which required willfulness, and that the district court therefore erred in imposing a $10,000 fine on each count. He asks us to vacate the $10,000 fine imposed under Count Three.

■ Conceding that Count Three was a lesser included offense of Count Four, the government therefore accepts Moskowitz's argument that sentencing him under both counts was improper. The government makes no argument that Moskowitz could properly have been convicted and sentenced under both Counts Three and Four. Rather, the government contends that the

proper remedy now is not simply to vacate the fine imposed on Count Three. The government's position is that the fines imposed on both Counts Three and Four should be vacated, and the case remanded so that the district court may impose a new fine on Count Four. In light of the government's position, we accept Moskowitz's claim that he was improperly punished twice for the same acts, and we therefore turn to the question of remedy.[2]

The parties' arguments here focus on that part of Moskowitz's sentence that imposed a fine. Because the terms of imprisonment under the two counts were imposed concurrently, the parties seem to accept that, as a practical matter, all that is at stake here is the amount of Moskowitz's fine. In this situation, however, we have recognized that although it may make little or no difference with respect to the sentence served or fine paid, there is a risk that collateral consequences may follow from a defendant's having two separate convictions rather than one. *See United States v. Aiello,* 771 F.2d 621, 633–35 (2d Cir.1985); *United States v. Osorio Estrada,* 751 F.2d 128, 134–35 (2d Cir.1984), *modified on other grounds,* 757 F.2d 27 (2d Cir.), *cert. denied,* 474 U.S. 830, 106 S.Ct. 97, 88 L.Ed.2d 79 (1985). It is not sufficient to simply vacate the $10,000 fine imposed under the lesser included offense or to remand only for resentencing with respect to the fine. Rather, the proper remedy under the law of this Circuit is to remand to the district court so that the convictions under Counts Three and Four can be "combined." *See United States v. Roman,* 870 F.2d 65, 76 (2d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989); *Aiello,* 771 F.2d at 634–35. Therefore, we vacate Moskowitz's sentences under Counts Three and Four and remand to the district court with instructions to combine the two convictions under those counts and resentence Moskowitz under the Count Four conviction. *See United States v. Benevento,* 836 F.2d 60, 73–74 (2d Cir.1987), *cert. denied,* ——

---

**2.** We accept Moskowitz's argument here on the basis of the government's concessions. In the absence of any advocacy favoring the position, we do not rule on the possibility that the two convictions could both be upheld as separate convictions.

U.S. ——, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988); *United States v. Aiello*, 814 F.2d 109, 115 (2d Cir.1987) (discussing result of *Aiello*, 771 F.2d at 634–35).

### D. *The Sentencing Guidelines*

In applying the Sentencing Guidelines, the first step facing a sentencing court is the selection of the guideline section applicable to the offense in question. Guidelines, § 1B1.1(a). A statutory index is provided to assist in this determination. *See id.* App. A. Once the applicable section is selected, that section is used to determine the base offense level. The base offense level may then be adjusted if a specific offense characteristic is found to be present. *Id.* § 1B1.1(b). Further adjustments in the offense level not relevant here may then be made. *Id.* § 1B1.1(c).

Where, as here, a defendant has multiple convictions, these steps are then repeated for each count of conviction, with each count thereby assigned an offense level. *Id.* § 1B1.1(d). The Guidelines then provide for the grouping of the various convictions. The combined offense level is determined by first taking the offense level of the group with the highest offense level. This number is then increased depending on how many other groups of offenses there are, and their offense levels. *Id.* § 3D1.4. The next step in the calculation permits the combined offense level to be reduced if the defendant has expressed an acceptance of responsibility. *Id.* § 3E1.1. The appropriate sentencing range is then determined based on the thus calculated offense level, together with the defendant's criminal history. *Id.* § 1B1.1(f), (g).

Moskowitz was sentenced under a combined offense level of fifteen. With a criminal history category of I, this meant that the applicable sentencing range was eighteen to twenty-four months. *Id.* Ch. 5, Pt. A. He maintains that the proper offense level was at least six levels lower. At an offense level of nine, the sentencing range would have been four to ten months. *Id.*

The record on appeal is not precise concerning the calculation of an offense level of fifteen for Moskowitz. The calculation would appear to have been made as follows. The Guidelines sections used by the district court revealed base offense levels of eight for both Counts Three and Four, *id.* § 2Q1.2, six for Count Five, *id.* § 2D2.1(a)(2), and eight for Count Six, *id.* § 2D2.1(a)(1). The offense levels were increased to twelve for both Counts Three and Four, under the specific offense characteristic of section 2Q1.2(b)(3). Counts Three and Four were grouped together as closely related counts, but Counts Five and Six were not. *Id.* § 3D1.2. The combined offense level was calculated by taking the highest offense level from the group consisting of Counts Three and Four, which was twelve. *See id.* § 3D1.3(a). Under the provisions for determining the combined offense level, one "unit" was assigned to the Count Three and Count Four group, one-half unit was assigned to Count Five, and one unit was assigned to Count Six. This was rounded off to three units, which meant that the offense level was increased by three, from twelve to fifteen. *Id.* § 3D1.4.

Moskowitz challenges this calculation in three respects. First, he argues that the district court erred from the start in selecting section 2Q1.2 as the section applicable to Counts Three and Four. Second, he argues that, even if that was the proper section, the offense level should not have been increased from eight to twelve for Counts Three and Four because the specific offense characteristic of section 2Q1.2(b)(3) was not satisfied. Third, he contends that his combined offense level should have been reduced by two based on his acceptance of responsibility.

### 1. *The Use of Section 2Q1.2 Under Counts Three and Four*

■ In sentencing for Counts Three and Four, the district court relied on section 2Q1.2, a section entitled "Mishandling of Hazardous or Toxic Substances or Pesticides; Recordkeeping, Tampering, and Falsification." Moskowitz argues that because his offenses were not related to the environment, this section, which deals with

environmental crimes, is inapplicable. Moskowitz's argument is without merit.

Moskowitz was convicted under Count Four of violating 49 U.S.C. App. § 1809(b). The sentencing guideline applicable to this offense is section 2K3.1, *see* Guidelines, App. A–Statutory Index, a section entitled "Unlawfully Transporting Hazardous Materials in Commerce." This section does not contain its own sentencing guidelines. Rather, it merely instructs the district court to "[a]pply the guideline provision for § 2Q1.2 (Mishandling of Hazardous or Toxic Substances or Pesticides; Recordkeeping, Tampering, and Falsification)." The Commentary to section 2K3.1 explains "[t]his conduct involves the same risks as the conduct covered under § 2Q1.2.... Accordingly, that guideline applies." Thus, the district court was correct in applying section 2Q1.2 to calculate Moskowitz's sentence under Count Four.

Prior to June 15, 1988, the Guidelines' Statutory Index did not contain an explicit instruction with respect to violations of section 1472(h)(2), the charge underlying the Count Three conviction. Under these circumstances, the court was instructed to apply "the most analogous guideline." As of June 15, 1988, however, the Statutory Index was amended to provide that the applicable sentencing provision for 49 U.S.C. App. § 1472(h)(2) is section 2K3.1. *See* Amendments to Sentencing Guidelines for United States Courts, 53 Fed.Reg. 15,-530 (1988). In light of this amendment, it seems clear that prior use of section 2K3.1 as "the most analogous guideline" for violations of 49 U.S.C. App. § 1472(h)(2) would have been justified. The district court properly treated Count Three the same as Count Four, applying section 2K3.1, which instructs the application of section 2Q1.2.

### 2. *The Four Level Specific Offense Characteristic Increase*

■ The district court increased Moskowitz's offense level under Counts Three and Four pursuant to the specific offense characteristic of section 2Q1.2(b)(3), which provides "[i]f the offense resulted in disruption of public utilities or evacuation of a community, or if cleanup required a substantial expenditure, increase by 4 levels."

Moskowitz argues that, as a factual matter, the specific offense characteristic of section 2Q1.2(b)(3) was not present here because there was no "disruption of public utilities or evacuation of a community, or ... cleanup" as envisioned by the section. As we have noted, section 2Q1.2, a provision designed primarily to deal with environmental crimes, applies here because the section applicable to Moskowitz, section 2K3.1, incorporates it by reference as "involv[ing] the same risks." It is to be expected that the fit of section 2K3.1 to the context of violations of 49 U.S.C. App. §§ 1472(h)(2) and 1809(b) might be a bit imprecise in some contexts. Perhaps there was not a "disruption" or "evacuation" here in exactly the sense one associates with major environmental disasters. Nevertheless, consideration must be given to the context in which these events occurred, namely, during the flight of a commercial airliner. Evacuation options were, to say the least, limited. A rear section of the plane was evacuated, and the flight to Miami was abruptly discontinued so that the plane could return to New York. Under the circumstances present, we find a characterization of these events as a "disruption of public utilities or evacuation of a community" to be apt.

Moskowitz contends, however, that it was erroneous to causally link the disruption of Flight # 977 to the conduct for which he was convicted. He maintains that the decision to return to New York did not result from the conduct for which he was convicted under Counts Three and Four, namely, causing canisters of butane and nitrous oxide to be transported on the flight. He concedes that "it was the flight crew's fear of the presence of ether and the activities of Mr. Moskowitz in the rear lavatory and his subsequent arrest which caused the change in the plane's course." Nevertheless, he points out that no canisters of butane or nitrous oxide were found at the time of the arrest. It was not until later, after the plane had landed back at JFK, that searches uncovered the canisters of the hazardous materials. He concludes

that the disruption of the flight had nothing to do with the illegal transportation of the butane and nitrous oxide.

There was evidence that butane was brought aboard the plane with the intent that at least some members of the group would "cook up" during the flight. When Moskowitz was found in the rear lavatory, he had with him a butane torch, although apparently it was empty by that time. Under these circumstances, we agree with the government that there was "an obvious relationship between [Moskowitz's] conduct and his transportation of butane canisters." It is understandable, then, why the district court undertook to include consideration of Moskowitz's conduct in the lavatory in calculating the sentence. More important, however, we find the district court's consideration of Moskowitz's activities in the rear of the plane to be supported by the Guidelines.

Under section 1B1.3(a), the district court's determination whether the specific offense characteristic of section 2Q1.2(b)(3) was present had to include consideration of Moskowitz's "[r]elevant [c]onduct," including:

> (1) all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense [and]
>
> . . . .
>
> (3) all harm or risk of harm that resulted from the acts or omissions specified in subsection[ ] (a)(1) . . . if the harm or risk was caused intentionally, recklessly or by criminal negligence, and all

harm or risk that was the object of such acts or omissions.

In permitting consideration of "[r]elevant [c]onduct," the Sentencing Commission foresaw that offense levels would sometimes be determined by the "real offense," not just the "charged offense." *See United States v. Guerrero*, 863 F.2d 245, 247–50 (2d Cir.1988); *see also United States v. Cervantes*, 878 F.2d 50 (2d Cir.1989) (citing Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest*, 17 Hofstra L.Rev. 1, 11–12 (1988)).

Moskowitz's activities in the rear of the plane constituted "acts . . . that occurred during the commission of the offense of conviction." Moreover, as his argument recognizes, Moskowitz's actions in the rear lavatory were causally linked to the disruption of the flight. Thus, Moskowitz's actions, as well as the "harm or risk of harm that resulted" were properly considered as "[r]elevant [c]onduct" in determining whether the specific offense characteristic of section 2Q1.2(b)(3) was present. The four level increase in Moskowitz's offense level was properly based on that conduct.[3]

3. *Acceptance of Responsibility*

 Moskowitz argues that the district court erred in refusing to reduce his offense level by two in light of his "acceptance of responsibility." Under section 3E1.1(a), a sentencing judge is instructed "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, reduce the offense level by two levels." Moskowitz submitted a two page affidavit purporting to be an acceptance of responsibility.

In the statement, Moskowitz blamed his situation on his drug problem. He insisted that he was now off drugs and regretted

---

**3.** We reject Moskowitz's effort to equate the jury's having acquitted him under Count One with a determination that he had not freebased cocaine in the rear lavatory. Count One charged him with "knowingly and willfully plac[ing] . . . destructive devices and substances in [the] aircraft so that such placing and causing to be placed was likely to endanger the safety of

[the] aircraft." The Court did not charge him with freebasing cocaine in the rear lavatory. Therefore, we have no occasion to consider how conduct of which a defendant has been acquitted should be treated in the calculation of sentencing ranges under the Guidelines. *Cf. United States v. Bedoya*, 878 F.2d 73 (2d Cir.1989) (per curiam).

the incidents in which he was involved. Yet, during the trial, Moskowitz had arrived in court carrying cocaine.

Moskowitz's affidavit further maintained that he had not known that his companions had brought the butane and nitrous oxide aboard that flight and that, in any event, he had been unaware that federal regulations prohibited carrying those items aboard the plane. Thus, Moskowitz, in his affidavit, clung to the positions that he had put forth in his defense at trial and which he continues to take in this appeal. The affidavit then stated "[i]n light of [these] facts, I accept responsibility for my conduct."

The fact that Moskowitz put the government to its proof at trial did not preclude a finding of acceptance of responsibility at the time of sentencing, *see United States v. Thomas*, 870 F.2d 174, 177 (5th Cir.1989); Guidelines, § 3E1.1, Commentary, Application Note 2, and it is true that Moskowitz's affidavit did concede some criminally culpable behavior, such as possession of heroin. Nevertheless, in adhering to the positions he took at trial, Moskowitz continued to maintain that he was in no way responsible for the most serious conduct for which the jury convicted him, the transporting of hazardous materials.

As the Commentary to section 3E1.1 of the Guidelines states, "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review and should not be disturbed unless it is without foundation." Guidelines, § 3E1.1, Commentary, Application Note 5. The district court evidenced understandable skepticism regarding the sincerity of Moskowitz's careful, narrowly tailored acceptance of responsibility. We see no basis for disturbing the district court's determination that Moskowitz was not entitled to a two level reduction.

## CONCLUSION

Moskowitz's sentences under Counts Three and Four are vacated. The matter is remanded to the district court with instructions to combine the convictions under Counts Three and Four and to resentence under Count Four. The judgment of the district court is affirmed in all other respects.