990 F.2d 1264
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carlos Tapia PONCE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Mauricio MONROY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
James Romero MCTAGUE, Defendant-Appellant.
 Nos. 91-50256, 91-50273 and 91-50749.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 2, 1992.
Decided April 1, 1993.
 
 Before BEEZER, KOZINSKI and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Ponce, Monroy and McTague were convicted of conspiring to possess, and of possessing for purposes of distributing, 21 tons of cocaine. After carefully studying all their points on appeal, we affirm on all grounds, but vacate the sentences.
 
 
 3
 I. Government's Use of Peremptories to Strike Black Jurors.
 
 
 4
 All defendants claim error because the prosecution used peremptory challenges to strike two black persons from the jury panel, Lorraine Smith and Terence Wilson. After the government struck the second of the two, Mr. Wilson, the defense moved for a hearing on whether the government had a non-racial justification. The court denied the motion because no pattern was apparent, and a nondiscriminatory explanation was obvious. Mr. Wilson had said that (1) he might not have time for the trial because of art projects he had, (2) when he heard about arrests of pushers, he saw this as an outward manifestation of deeper crime in higher places mostly immune from the law, and (3) he compared street crime to people who are sick, people whose actions are predictably desperate. The judge noted that his tone of voice made it apparent that Wilson was "upset about having been called." The judge considered the pattern, observed that another black juror had been drawn and not challenged and others remained in the pool, and, far from the prosecution challenging minority jurors, "it's clear there is a pattern of excusing white jurors or Anglo jurors." We review the district court's conclusion as to whether a defendant established a prima facie case of discrimination for clear error. United States v. DeGross, 960 F.2d 1433, 1442 (9th Cir.1992) (en banc).
 
 
 5
 Although defendants are not black, they have standing to bring a claim that blacks were excluded from the jury in violation of their Due Process rights. Powers v. Ohio, 111 S.Ct. 1364, 1371 (1991);[1] De Gross, 960 F.2d at 1437. To establish a prima facie case of purposeful discrimination, a litigant must show that a peremptory challenge was exercised against a member of a constitutionally cognizable group, and that this fact and other relevant circumstances raise an inference that the challenge was on account of group membership. De Gross, 960 F.2d at 1442. Only when a prima facie case of discrimination has been established does the burden shift to the challenging party to articulate a nondiscriminatory reason. We have stated that "the challenge of two minority jurors does not, in and of itself, create a prima facie case of purposeful discrimination.... Rather, the combination of circumstances taken as a whole must be considered." United States v. Chinchilla, 874 F.2d 695, 698 (9th Cir.1989).
 
 
 6
 In this case, although the first part of the test for a prima facie case was met, the trial judge found that the second was not. He took note of the lack of pattern, and the reasons obvious to him why Mr. Wilson might be challenged on nonracial grounds. The record demonstrates the basis for this finding, and it was not "clearly erroneous."[2]
 
 
 7
 II. Ponce's Confession.
 
 
 8
 Ponce claims that his confession should have been suppressed on two grounds. First, his right to counsel was violated because the police resumed questioning after he had indicated he wished to consult counsel. Second, the confession was the fruit of an unlawful arrest.
 
 
 9
 A. Sixth Amendment Claim.
 
 
 10
 We review de novo whether inquiries constitute interrogation. United States v. Gonzales-Sandoval, 894 F.2d 1043, 1046 (9th Cir.1990). We review for clear error factual findings, such as who said what to whom. United States v. Bland, 908 F.2d 471, 472 (9th Cir.1990).
 
 
 11
 Despite the lack of a search warrant or arrest warrant, the agents got a key to Ponce's hotel room from hotel security, awaited Ponce's return inside his room, and arrested him when he came in. The trial judge suppressed items seized in the room because the entry was without a warrant, but denied the motion to suppress the confession. The judge found that the agents' account of who said what to whom was true, and Ponce's was false. After being handcuffed in his room and advised of his rights, Ponce said he wanted a lawyer, so questioning of him stopped. Then he was taken to the police station. At the police station, while one agent asked Ponce standard identity questions for booking, an immigration officer assigned to the drug enforcement task force came in and asked Ponce about his immigration status. Ponce asked what would happen to him, so one of the agents explained that he would be charged, arraigned, considered for release on bail, tried by a jury, and if convicted, sentenced. Ponce then said he wanted to cooperate but was concerned about his family and did not know how to cooperate. The agents told him that if he cooperated, they could not guarantee him any benefits, but the court would be advised of his cooperation.
 
 
 12
 Ponce's argument is that the agents began questioning him again, even though he had not been given an opportunity to consult counsel. The issue turns on who initiated the conversation. Oregon v. Bradshaw, 462 U.S. 1039, 1043-44 (1982); Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). That is not answered by determining who spoke first. The issue is whether the police invited the suspect to talk more about the crime after the suspect said he wanted a lawyer. Shedelbower v. Estelle, 885 F.2d 570, 573-74 (9th Cir.1989), cert. denied, 111 S.Ct. 975 (1991).
 
 
 13
 "Routine gathering of background biographical data does not constitute interrogation sufficient to trigger constitutional protections." United States v. Perez, 776 F.2d 797, 799 (9th Cir.1985). Also, the immigration questions posed by one of the agents were not asked in order to gather data for a possible prosecution of Ponce for violations of immigration laws. See Gonzalez-Sandoval, 894 F.2d at 1046-47 ("[t]he relationship of the question asked to the crime suspected is highly relevant"). Ponce's responses to the immigration questions were never used against him at trial. The questions did not refer to the subject matter of Ponce's case, and they were not the sort "reasonably likely" to elicit a denial, admission, alibi, or any incriminating remark or conduct. See Shedelbower, 885 F.2d at 573.
 
 
 14
 This case is much like Bradshaw, 462 U.S. at 1045, where a suspect "initiated" conversation with officials when he asked them "Well, what is going to happen to me now?" In Ponce's case, the agents spoke first, but their inquiries were booking questions, and the words immediately preceding Ponce's decision to confess were a description of the legal system. The agents did not ask or suggest that Ponce talk more about the cocaine. The district court did not err in finding that the agents did not resume interrogation in violation of Ponce's right to counsel.
 
 
 15
 B. Fourth Amendment Claim.
 
 
 16
 Ponce argues that his confession should have been suppressed because it was obtained as a result of his unlawful arrest. The government in its brief "concedes that Ponce was arrested illegally in that while agents had ample probable cause, they did not have an arrest warrant." Ponce does not dispute probable cause for his arrest. The police had watched Ponce participate in the transfers of boxes at the warehouse, knew that a dog had sniffed cocaine on a piece of one of the boxes, learned that Ponce leased the warehouse and the shared apartment, and had found the 21 tons of cocaine and $12,000,000 in cash in the warehouse pursuant to the search warrant. Ponce's Fourth Amendment argument is that, but for the warrantless arrest following the warrantless entry into his hotel room, he would not have confessed about an hour later in the police station. Accordingly, his confession should be suppressed as a fruit of the unlawful arrest.
 
 
 17
 Ponce relies principally upon Brown v. Illinois, 422 U.S. 590 (1975), for the proposition that a confession resulting from an unlawful arrest must be suppressed. But New York v. Harris, 495 U.S. 14 (1990), distinguished Brown. In that case, an in-home arrest followed an unlawful entry, but there was probable cause for the arrest. Id. at 21. Once the suspect has been advised of his rights and taken to the police station, his custody is not illegal. Therefore, though following an illegal arrest, later statements are not the fruits of any illegal aspect of that arrest. Id. at 20, 22. Under Harris, Ponce's Fourth Amendment argument must be rejected.
 
 
 18
 III. Admission of the Computer Records.
 
 
 19
 The agents found a computer disk at the home shared by two of the defendants, and made a printout of the data on it. Ponce argues that the printout was inadmissible hearsay, because insufficient foundation was laid to bring it within the business records exception or any other. We review the district court's decision for abuse of discretion. United States v. Huguez-Ibarra, 954 F.2d 546, 553 (9th Cir.1992).
 
 
 20
 The printout was not hearsay, because it was not "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The experienced DEA agent, through whom the printout was admitted, testified that the printout was, in his opinion, a ledger of narcotics transactions. The trial judge determined that the printout was relevant on the grounds that the computer disk, from which the printout was made, contained a drug ledger and was found at the defendant's home. The truth or accuracy of any of the entries in the ledger was immaterial.
 
 
 21
 Ponce argues that admission of the printout was barred under United States v. Lai, 944 F.2d 1434 (9th Cir.1991), cert. denied, 112 S.Ct. 947 (1992), United States v. Mouzin, 785 F.2d 682 (9th Cir.), cert. denied, 479 U.S. 985 (1986), and United States v. Ordonez, 737 F.2d 793 (9th Cir.1984). But in those cases, the records were improperly admitted under the co-conspirator exception to the hearsay rule, evidently to prove what the entries said. Ordonez especially noted that "[n]o issue has been raised before this court as to the admissibility of the ledgers, not for the truth of the matter asserted, but as circumstantial evidence 'to show the character and use of the place where the notebooks were found.' " Id., at 799 (quotation omitted). The distinction between drug ledgers introduced to prove their contents and drug ledgers introduced to prove that the place where they were found was used for drug transactions was drawn explicitly in United States v. Huguez-Ibarra, 954 F.2d 546, 552 (9th Cir.1992) and United States v. Jaramillo-Suarez, 950 F.2d 1378, 1382-83 (9th Cir.1991). Those cases explain that the Ordonez rule does not bar admission for the latter purpose. We cannot see how, in the context of this particular case, the jury could have used the printouts for any purpose except the legitimate one.[3]
 
 
 22
 IV. Ponce's Sentencing Adjustment as Organizer or Leader.
 
 
 23
 Ponce argues that the district court erred in adjusting his offense level upward by four levels on the ground that he was an "organizer or leader." We review for clear error. United States v. Monroe, 943 F.2d 1007, 1019 (9th Cir.1991), cert. denied, 112 S.Ct. 1585 (1992).
 
 The applicable guideline section states:
 
 24
 Based upon the defendant's role in the offense, increase the offense level as follows:
 
 
 25
 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
 
 
 26
 U.S.S.G. § 3B1.1. In the presentence report, the probation officer recommended an upward adjustment pursuant to § 3B1.1(a). The district court adopted the findings of the probation officer and made a four-level upward adjustment.
 
 
 27
 The factors to be considered in making the determination of whether Ponce was an organizer or leader include: the exercise of decisionmaking authority, the nature of the offense and the defendant's participation in the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, and the degree of control and authority exercised over others. See United States v. Hernandez, 952 F.2d 1110, 1119 (9th Cir.1991), cert. denied, 113 S.Ct. 334 (1992); United States v. Sanchez, 908 F.2d 1443, 1448 (9th Cir.1990).
 
 
 28
 The presentence report found that Ponce, "considered the patriarch of this organization ..., established and maintained various business locations and entities to facili[ta]te the success of the operation." The report also states that:
 
 
 29
 defendant is the father to Hector and Carlos Tapia-Anchondo and allowed them to manage the El Paso aspect of the operation. He was also the father-in-law to defendants McTague and Monroy, allowing McTague to manage the Los Angeles aspect of the operation. His recruitment of these individuals further supports the leadership role he possessed. Defendant Ponce rented the warehouse where the cocaine and money were stored, leased and purchased vehicles using alias names, organized the operation, and oversaw the arrival of the cocaine. He was the main authority on how the operation would be operated and designated who would be responsible for what tasks.
 
 
 30
 Ponce argues that his ownership or lease of the property on which the drugs were stored, even knowing that others were using his property to store drugs, is insufficient to support a finding that he was a "leader" or "organizer." See United States v. Tamez, 941 F.2d 770, 777 (9th Cir.1991); United States v. Mares-Molina, 913 F.2d 770, 773-74 (9th Cir.1990). Ponce did not merely suffer his business property to be used in drug operations. He created and organized the entire business as a front for a major drug operation. He also participated in the day-to-day operation of the drug activities, as evidenced by the fact that his handwriting was found on ledgers and the pallets of cocaine. He enlisted his sons and sons-in-law to manage different branches of the operation and to report to him. The district court's finding that Ponce was an "organizer" or "leader" is not clearly erroneous.
 
 
 31
 V. Search of the Car and Warehouse.
 
 
 32
 Monroy and McTague argue that the district court erred in failing to suppress evidence obtained during searches of the Dodge Aries and warehouse because the searches were made pursuant to warrants issued on the basis of "tainted" evidence obtained from a prior illegal search. Specifically, they claim that their Fourth Amendment rights were violated when police officers entered upon private property surrounding the warehouse, seized a portion of a cardboard box lying outside of the warehouse, and subjected the box to a dog sniff test at police headquarters. As a result, they argue, the warrants authorizing searches of the car and warehouse were invalid because they were based upon the "tainted evidence of the illegally seized cardboard boxes." The ultimate issue of the lawfulness of a search presents a mixed question of law and fact which we review de novo. United States v. Huffhines, 967 F.2d 314, 316 (9th Cir.1992).
 
 
 33
 Defendants base their argument on the proposition that officers trespassed on private property to reach the boxes and physically appropriated a fragment of the box. For the reasons stated below, this is insufficient to amount to a "search" or "seizure" within the scope of the Fourth Amendment.
 
 
 34
 Entry upon private property does not render police actions a "search" within the scope of the Fourth Amendment. See Oliver v. United States, 104 S.Ct. 1735, 1741 (1984); United States v. Roberts, 747 F.2d 537, 541-42 (9th Cir.1984) (officers' investigative journey down private road did not amount to a search). Here, the officers did not stray beyond the open area surrounding the warehouse. The boxes were lying outside of the warehouse structure in an alleyway accessible to the general public. There were no fences or other structures restricting access to the area, and no signs prohibiting entrance into the area. Defendants had no actual or reasonable expectation of privacy in the area in which the boxes were located, so the officers' entry onto the property surrounding the warehouse did not constitute a "search."
 
 
 35
 Also, because the boxes had been abandoned, defendants lack standing to complain about their "seizure." United States v. Nordling, 804 F.2d 1466, 1469 (9th Cir.1986). The boxes were flattened, cut up, left in an open alleyway alongside the warehouse like trash, and left completely unguarded. This showed that the owners of the boxes "relinquished a reasonable expectation of privacy" in the boxes. Id.
 
 
 36
 VI. Failure to Depart Downward Pursuant to § 5K1.1.
 
 
 37
 McTague argues that the district court erred in refusing to depart downward pursuant to § 5K1.1 in light of his substantial assistance to authorities. This section provides in part that:
 
 
 38
 Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.
 
 
 39
 Here McTague, not the government, moved for a § 5K1.1 departure. The district court denied the request to depart. A district court's determination that it lacked the discretion under the Guidelines to depart is reviewed de novo. United States v. Reyes-Alvarado, 963 F.2d 1184, 1189 (9th Cir.), cert. denied, 113 S.Ct. 258 (1992).
 
 
 40
 Under section 5K1.1, the district court has no authority to depart downward unless the government makes a motion. While there may be exceptions to this rule in some circumstances, see United States v. Wade, 112 S.Ct. 1840 (1992) and United States v. Mena, 925 F.2d 354, 355 (9th Cir.1991), McTague has not demonstrated that any would apply.
 
 
 41
 VII. McTague's Post-Arrest Confession.
 
 
 42
 McTague argues that because officers questioned him before giving him his Miranda warnings, his subsequent confession should have been suppressed. The voluntariness of an asserted Miranda waiver is reviewed de novo. Collazo v. Estelle, 940 F.2d 411, 415 (9th Cir.1991) (en banc), cert. denied, 112 S.Ct. 870 (1992). The question of whether the defendant's "mind was overborne--i.e., was his waiver knowing and intelligent," is reviewed for clear error. Id. at 416. The district court's factual findings underlying its decision, such as what the defendant was told, are reviewed for clear error. United States v. Bland, 908 F.2d 471, 472 (9th Cir.1990).
 
 
 43
 We reject McTague's argument, because "a voluntary confession merely inadmissible on the ground of Miranda does not taint a subsequent voluntary confession." Greenawalt v. Ricketts, 943 F.2d 1020, 1026 (9th Cir.1991), cert. denied, 113 S.Ct. 252 (1992) (citing Oregon v. Elstad, 470 U.S. 298, 306, 309 (1985)). The district court found that there was no coercion, and McTague has not demonstrated that this finding was erroneous. The court correctly admitted McTague's confession.
 
 
 44
 VIII. Evidentiary Hearing on Delay in Appearance.
 
 
 45
 Monroy was arrested Friday morning September 29, but was not brought before a municipal court judge until Monday afternoon, October 2. During this period of over 72 hours he confessed twice, Friday afternoon and Sunday afternoon. On appeal, Monroy argues that the district court erred by denying him a hearing on whether his confessions should have been suppressed under 18 U.S.C. § 3501(c) because of the unreasonable delay in appearance. He does not argue that he was entitled to suppression under section 3501 based upon the delay in his first appearance before a court.
 
 
 46
 Our careful review of the record leads us to the conclusion that the district court did not err in denying Monroy's request for an evidentiary hearing on his section 3501 claim. Monroy initially made a motion to suppress, challenging the voluntariness of his confession. At that time he did not raise the issue of § 3501(c). The court held a hearing, and denied the motion. Monroy later moved to reopen the hearing when the court excluded the testimony of his expert witness concerning the initial appearance process. The colloquy between Monroy's counsel (Nasitir) and the court was as follows.
 
 
 47
 Mr. Nasitir: Your honor, I would further request this court to reopen the motion to suppress statements that was previously heard by this court. I don't think that my client should suffer because I have lately come to this issue. I would ask that your honor consider this evidence in terms of the voluntariness of his confession. I would ask you to reopen the evidence and allow this testimony to be entered in that record.
 
 
 48
 The Court: Well, again, you would have this witness stand in and step before the jury as you propose, but for the fact finder and in the previous matter, that is, this court, this court is conversant with that which this witness has indicated he would testify to. So it has been considered, frankly. And again, your record is complete--
 
 
 49
 Mr. Nasitir: Will your honor then take judicial notice of the items testifies to by and facts and circumstances and opinions testified to by Mr. Lightfoot, and laws, and reopen and reissue a ruling in our motion to suppress?
 
 
 50
 The Court: Taking judicial notice of it is unnecessary, because it was considered. And there's no basis, given the total set of circumstances, given the state of the law, this court found that it wasn't practical to, even though driving by on the freeway passing this court as well as the criminal court building, and various other courts I would assume, on the way to the Huntington Park Police Station. No, there is no reason to reconsider the court's previous ruling, and I will not.
 
 
 51
 The following day, Monroy again moved to reopen and, in the alternative, to suppress the confession, this time specifically on the basis of § 3501. The court allowed the government an opportunity to research the issue, and returned to the issue a few days later. At this point, the government brought to the court's attention United States v. Halbert, 436 F.2d 1226 (9th Cir.1970). In response, Monroy's counsel stated that "I don't think I have to restate my position, do I, your honor?" The court responded "No, you do not. Your record is complete." The court did not say anything else with regard to this matter, so we infer that the motions were denied.
 
 
 52
 At the time of the court's ruling on the first motion to reopen, the court had before it evidence of the delay in Monroy's appearance before a judicial officer and the reasons for the delay. The court expressly found that the delay had no effect on the voluntariness of Monroy's confession, and also found that the delay was reasonable. Monroy subsequently realized and informed the court that § 3501 might apply. The court considered the issue and gave Monroy the opportunity to elaborate further on his position. Monroy did not, and does not here, point to any additional evidence he would have brought before the court had the court granted his motion to reopen. The district court had all of the evidence necessary to resolve the motion, so a further evidentiary hearing would have been superfluous.
 
 
 53
 IX. Monroy's Right to Present His Defense.
 
 
 54
 Monroy argues that the district court erroneously refused to allow him fully to present to the jury his defense of involuntariness of his confession. By this defense, Monroy wanted to show that the confession was false, so that the jury should not convict on the basis of what Monroy said, because of the coercive circumstances in which he confessed. The evidence he was barred from putting before the jury was testimony by a purported expert witness, unfamiliar with the details in Monroy's case, explaining what an initial appearance was, the requirement of an initial appearance without unreasonable delay, and what would have happened if Monroy had been brought before a judicial officer. Monroy was also barred from cross-examining a DEA agent regarding the delay of his first appearance because the question called for hearsay. He relies primarily on Crane v. Kentucky, 476 U.S. 683 (1986).
 
 
 55
 In Crane, the Supreme Court held that the trial court's exclusion of evidence concerning the physical and psychological circumstances surrounding the defendant's confession violated the defendant's rights under the Fourteenth and Sixth Amendments. 467 U.S. at 690. The defendant had sought to introduce evidence that he had been detained in a windowless room for a protracted period of time, surrounded by several officers during the interrogation, denied the opportunity to telephone his mother, and badgered into making a false confession. Id. at 685. The lower courts refused to admit any such evidence, holding that voluntariness was an issue solely for the court. The Supreme Court reversed, holding that the right to present a complete defense "would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." Id. at 690.
 
 
 56
 We conclude that Monroy was not denied a "meaningful opportunity to present a complete defense." Id. (quotation omitted). The expert witness' testimony was properly excluded. The judge, not expert witnesses, instructs the jury in the law. See Brodie 858 F.2d 492, 496 (9th Cir.1988). Monroy's counsel was allowed to ask one of the agents whether he "direct[ed] the arresting agents to take Mr. Monroy before a judge to be arraigned," to which the agent responded "No, I did not."
 
 
 57
 Finally, Monroy was given the opportunity to prove the long delay between arrest and his first appearance. The court excluded testimony regarding the delayed appearance which it found to be hearsay, and suggested that Monroy obtain a stipulation or submit a certified record of which the court could take judicial notice. This ruling did not bar Monroy from proving the delay to show involuntariness and unreliability of his confessions. It only went to the form and the particular kinds of evidence by which the facts could be proved.
 
 
 58
 X. Failure to Give Proposed Jury Instruction.
 
 
 59
 Monroy argues that the district court erred in refusing to instruct the jury on his theory of defense, i.e., that it could consider the delay of his first appearance in weighing the credibility of his confession.
 
 The court instructed the jury that:
 
 60
 evidence relating to any statement or act or omission claimed to have been made or done by a defendant outside of court and after a crime has been committed should always be considered with caution and weighed with great care. And all such evidence should be disregarded entirely, unless the evidence in the case convinces you, as a jury, beyond a reasonable doubt that the statement or act or omission was knowingly made or done.
 
 
 61
 A statement or act or omission is knowingly made or done if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.
 
 
 62
 In determining whether any statement or act or admission claimed to have been made by a defendant outside of court after a crime has been committed, was knowingly made or done, as a jury, you should consider the age, sex, training, education, occupation, and physical and mental condition of the defendant, as well as his or her treatment while in custody, or under interrogation, as shown by the evidence in the case; and also all other circumstances in evidence surrounding the making of the statement.
 
 
 63
 If after considering the evidence you determine that a statement, act, or admission was knowingly made or done, you will give it such weight as you feel it deserves under the circumstances.
 
 
 64
 The court refused to give a proposed defense instruction paraphrasing Federal Rule of Criminal Procedure 5(a), but offered to give an instruction proposed by the government that said substantially the same thing, but added some qualifications, and to allow in evidence that Monroy had waived arraignment. Monroy said that he preferred no instruction and exclusion of the evidence, and the court acceded to his preference. This was not error.
 
 
 65
 XI. Upward Departure Pursuant to § 5K2.0.
 
 
 66
 All three defendants claim the district court erred in departing upward from the guidelines because of the extraordinary quantity of drugs involved in this case.[4] We review such a decision to depart by deciding whether the guidelines permit a departure on the ground cited by the sentencing judge and, if so, whether the sentence imposed by the judge was reasonable. United States v. Bennett, 900 F.2d 204, 206 (9th Cir.1990).
 
 
 67
 Defendants correctly argue that United States v. Martinez, 946 F.2d 100 (9th Cir.1991), controls. In Martinez, we held that the quantity of drugs involved in the offense is not a permissible basis for departing from the guidelines where the sentence is already determined on the basis of the quantity of drugs involved. In so holding, we stated that the guidelines language "indicates that the Sentencing Commission did consider the circumstance of higher quantities of cocaine and concluded that the level was to be the same regardless of how much more than fifty kilograms of cocaine was involved." Id. at 102. Bennett and the other cases cited by the government are clearly distinguishable from this case. These cases dealt with convictions for use of a telephone to facilitate drug transactions. Upward departures were permissible because the sentences for these convictions did not take into account the quantity of drugs involved.
 
 
 68
 The government urges us to distinguish Martinez in light of the huge difference in the quantity of drugs involved. In this case, over 19,000 kilograms of cocaine were seized. Martinez, in contrast, involved only 530 kilograms of cocaine. The governemnt is of course correct that factually the cases are very different. What Llewellyn calls the strict view of precedent might allow for Martinez to be distinguished. See K.N. Llewellyn, The Bramblebush, in Karl Nickerson Llewellyn on Legal Realism 63-64 (1986). But the stated ratio decidendi of Martinez applies, and the language "regardless of how much more" does not invite a distinction based on quantity. Martinez compels us to vacate the sentences, because the district court erred in departing from the guidelines based on the quantity of drugs involved. Defendants' sentences should be recalculated accordingly.
 
 
 69
 AFFIRMED, except that the SENTENCES are VACATED AND REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Contrary to what defendants state in their briefs, their claim is not based upon the equal protection clause, as they are federal defendants. However, as the Constitution's equal protection guarantees remain applicable through the fifth amendment due process clause, Bolling v. Sharpe, 347 U.S. 497, 498-500 (1954), they do have a due process claim. Equal protection claims under the fifth amendment are treated in the same fashion as such claims under the fourteenth amendment. United States v. Bishop, 959 F.2d 820, 823 (9th Cir.1992)
 
 
 [2]
 We also note that the jury selected included at least two black and three Hispanic jurors. See Chinchilla, 874 F.2d at 698 n. 4 (willingness of a prosecutor to accept minority jurors weighs against the finding of a prima facie case of discrimination)
 
 
 [3]
 Ponce also argues that the district court failed to give a limiting instruction. Ponce did not request such an instruction, however, and it was not plain error not to give one
 
 
 [4]
 Monroy also claims the district court violated the ex post facto clause by sentencing him under the guidelines in effect at the time of sentencing rather than at the time of the offense. We have determined, however, that the court did not apply the amended guidelines, but simply used them as a guide in departing from the guidelines because of the quantity of drugs involved in this case. The only question, then, is whether the upward departure was permissible